[No. 1938.]

## Arthur Loyd v. The State.

### (ON MOTION TO REINSTATE APPEAL.)

1. Practice.— Escape of a defendant pending his appeal from a felony conviction operates to oust the jurisdiction of the court of appeals, and upon the fact of such escape being made to appear this court has no option but to sustain a motion to dismiss the appeal. The order of dismissal, however, will be set aside when it is shown that the defendant returned voluntarily to custody within ten days.

2. Same.— Article 846 of the Code of Criminal Procedure requires that, when the escape of a convicted felon occurs, pending his appeal, the sheriff who had him in custody shall report the fact, under oath, to the district or county attorney of the county in which the conviction was had, who shall forthwith forward such report to the attorney-general at the branch of this court to which the transcript in the case was sent; which report shall be sufficient evidence of the fact of such escape, to authorize the dismissal of the appeal. *Held*, that the article cited, properly construed, requires that the sheriff's report of the escape of the defendant, in order to be sufficient, must set forth the facts and circumstances constituting the escape, and not state merely his own conclusions or impressions.

3. Same — Construction of Terms — "Escape." — Article 10 of the Penal Code provides as follows: "Words which have their meaning specially defined shall be understood in that sense, though it be contrary to their usual meaning, and all words used in this Code, except where a word, term or phrase is specially defined, are to be taken and construed in the sense in which they are understood in common language, taking into consideration the context and subject-matter relative to which they are employed." Tested by this rule the word "escape," as used in articles 845 and 846 of the Code of Criminal Procedure, means that the prisoner has "actually and completely withdrawn himself from custody," and "has got free and gone at large." Such an escape is not made manifest by an officer's report which recites that the defendant broke jail and was captured two or three hundred yards distant from the jail, and was returned thereto within fifteen or twenty minutes after he broke jail.

4. Same — Jurisdiction of the Court of Appeals.— The court of appeals can resume jurisdiction of an appeal dismissed because of the escape of the appellant from custody after his conviction, and pending his appeal, only when it is made clearly to appear that the appellant's return to custody was *voluntary* and not *compulsory*, and that it was made within ten days.

5. Same — Constitutional Law.— Articles 10 and 19 of the Constitution have no application whatever to proceedings had in criminal cases after trial and conviction.

6. Same.— It was within the legitimate power of the Legislature to declare that the escape of a prisoner, convicted of a felony, pending his appeal, operates as an abandonment of his appeal.

(ON THE MERITS OF THE CASE.)

7. Evidence.— Confessions of a prisoner of material facts tending to connect him with the offense charged, even though made in custody and without warning, are admissible in evidence if in connection therewith he make statement of facts or of circumstances that are found to be true, which conduce to establish his guilt.

8. Same.— The admission of hearsay evidence in this case was subsequently rendered immaterial by proving the same facts by the person on whose authority the hearsay statement was made.

9. Same — Fact Case.— See the statement of the case for evidence which, though circumstantial, is held ample to support a conviction for murder in the second degree.

Appeal from the District Court of Jones. Tried below before the Hon. William Kennedy.

The indictment charged the appellant with the murder of E. Price Ogle, in Jones county, Texas, on the 3d day of April, 1884. His trial resulted in his conviction of murder in the second degree, and his punishment was assessed at a term of forty years in the penitentiary.

B. F. Britton was the first witness for the State. He testified that he lived in Jones county, about eighteen miles southeast from the town of Anson, and on the main road leading from that town to Abilene in Taylor county. He recognized the defendant as one of two men whom he first saw on the night of April 2, 1884. The defendant and his companion, traveling from the direction of Abilene, reached the witness's house about 7 o'clock on the evening stated, and remained over night, resuming their journey about 7 o'clock on the next morning, going along the main road, northwest, toward Anson. They told the witness that they came from Hog Creek, some fifteen miles distant from Waco, and were going to the Double Mountain Fork of the Brazos to work on a cow ranche. The defendant paid the witness two silver dollars for their night's entertainment. The person with the defendant was a young man, apparently twenty-one years old, about six feet in height, with dark hair and blue eyes. He was slender of build, and appeared to be either in delicate health, or just recovering from a severe illness. He was crippled in his left foot. He wore a boot on his right foot,

and on his left a shoe, the vamp or upper of which was mashed down under his foot,— the foot itself being still in bandages, and somewhat bare. His appearance was very genteel. He wore a dark coat and dark pants, a white shirt with a large gold or metal bosom-button. Witness did not remember the color of the vest he wore. He had a double cased silver watch, and a chain, the material of which witness could not remember. The crippled man wore a new looking felt hat, and rode a bay horse; the defendant had on a worn white hat, and rode a sorrel or yellow horse. The witness did not learn their names while they were at his house, but had since been told that the name of the defendant is Loyd, and that the name of the crippled man · was Ogle. The witness knew Mr. Buie, who lived twelve or fourteen miles from witness's house, and in the direction taken by defendant and Ogle when they left witness's house. About five days after the defendant and Ogle left the witness's house, Deputy Sheriff Scarborough showed the witness a photograph, taken evidently from a corpse, which the witness instantly and positively recognized as the photograph of the crippled man he described.

J. A. Buie, the next witness for the State, testified that he lived in Jones county, Texas, about six miles southwest of the town of Anson. Witness first saw the defendant about half-past 11 o'clock on the morning of April 3, 1884, on his, the witness's, place. The defendant and another man came to the field where the witness was at work. The defendant came into the field, and to the point where the witness was; the other man remained at the fence on the outside, about one hundred yards distant, in charge of the horses. Defendant asked the witness for information about the road to Double Mountain Fork, the road to Rock Springs, about the people who lived on the road, and the distances between the houses of the different settlers on the road. Witness answered all of his questions. Witness could not describe the appearance of the man who stayed with the horses at the fence. He appeared to be a tall man. Witness took no notice of that man's features, nor did he observe that he wore or did not wear gray whiskers, or that he otherwise appeared youthful or aged. Three days later the witness saw the corpse of a man in Anson. Witness did not charge his memory with the description of hat worn by the man at the fence. Witness did not notice that the defendant wore a watch when he was in the field, or that he wore a vest.

Mrs. Barbara Armstrong was the next witness for the State. She testified that she lived in Jones county, Texas, about seven miles

southwest of Anson. Witness was not acquainted with the defendant. Witness remembered the reputed discovery of the dead body of a man in Jones county, in April, 1884. She was in Anson on one Sunday while the corpse was said to be in town, but she did not see it. On the Thursday before the Sunday on which, in Anson, the witness heard of the discovery of the dead body, two men ate dinner at the witness's house. One of them was a tall man with dark hair and beard, and dark side-burns, and he was lame in one foot. The other was a light complexioned man of low stature and heavy build. Witness took no particular notice of the two men. They were traveling horseback, one riding a white-faced bay, and the other a dun horse. Witness did not know whether neither, either or both had a watch. They both wore light colored hats. The lame man wore his shoe with the top cut out or pressed down. They reached witness's house a little before 12 o'clock and left a little before 1, going in a northwest direction, along the main road. Mr. J. A. Buie lived about three-fourths of a mile southeast from the witness's house. Neither of the parties called each other by name while at witness's house, and if she has seen either since she does not know it. The heavy set man paid witness for the dinners.

W. H. Smith was the next witness for the State. He testified that he lived at Anson in Jones county, Texas. He was one of a surveying party at work in the northwest portion of Jones county, between the 1st and the 7th days of April, 1884. Between 8 and 9 o'clock on the morning of Saturday or Sunday, April 5, 1884, that surveying party discovered the dead body of a man. It lay, back down, in the bed of a small creek. The head had been penetrated by a pistol ball which entered at the region of the right ear. The tracks of a man were discovered, which left the head of the body, going up the bed of the creek about twelve feet and leaving the bed by the south bank. The bed of the creek was about four feet wide and five feet deep. A saddle was found near the corpse which looked like the saddle afterwards placed in the custody of the witness as the saddle brought to town with the corpse. This saddle was afterwards proved and recovered by Mr. Webb of Abilene and another man whose name witness had forgotten. The track described appeared to have been made just after a shower of rain and by a man walking. The creek was grass-bound on both banks, and it was not an easy matter to decipher tracks. Mr. Little went with the witness to the corpse. They found no pistol or other weapon near it. The body was found in Jones county, on Dry California creek.

John H. McLendon was the next witness for the State. He tes-

tified that he was a resident of Anson, Jones county, Texas, on April 5, 1884, and, at that time was justice of the peace of that precinct. On the date mentioned, the witness, in his official capacity, held an inquest upon the dead body of a man found in the bed of Dry California creek, in the northwest corner of Jones county. Witness first saw the body between 3 and 4 o'clock, P. M. It was then lying, back down, on two blankets. The bed of the creek at the point where the body lay was some four or five feet wide, and the banks on either side about five feet high. A bullet hole was found about one inch behind the right ear. On Sunday, the next day, two physicians, in the presence of the witness, cut into this wound and extracted a leaden bullet of about thirty-eight caliber, which had penetrated the brain. Examination of the immediate vicinity of the body disclosed the tracks of two men, near and on the north side of the creek, and down the creek about thirty yards from the point where the body lay. Witness saw tracks at another point about ten steps distant, down the creek. At another point where a cow-trail leads down to the creek, the witness saw some cracker crumbs, and some leather whittlings. The tracks of two men left this point going into the bed of the creek to the point where the body lay. These tracks were all made just after a shower of rain. There were other tracks about the body, which had been made after the ground got dry. These were fresher, and unlike those first described. The deceased had a boot on his right foot, and an old brogan shoe, with the vamp cut out, on his left foot. This boot and shoe corresponded with one of the tracks made just after the shower, the right foot or boot track being plainer than the shoe. The tracks of the other person were smaller. Near the point where the first described tracks were found, the witness found the tracks of two horses, made, as indicated by the ground, at the same time. The witness, by means of the tracks, trailed the horses back in the direction whence they came, and found that they crossed the creek about one hundred and fifty or two hundred yards below the point where the body was found. Thence the witness followed the tracks back into the Double Mountain Fork and Abilene road, about a quarter of a mile from the creek, and thence some distance towards Abilene.

Continuing, the witness testified: "I also noticed in this road tracks of the same horses made going in the direction of Abilene, and in a different direction from the way the tracks indicated that the horses were traveling that I was first tracking backwards. I took this newly discovered trail and trailed it back and found that

the two horses had come from the direction of the corpse into the road within about ten or fifteen steps of where they had left it when they first left the road to go in the direction of where the corpse was found. I back-tracked the horses in the direction of the corpse, crossed the creek about one hundred yards below the corpse, and followed the trail back to where I first discovered it. I noticed that the tracks that were made by the two horses, after they left the road and before they got to the place where the corpse lay, were in some places close together, and at other places some distance apart, with trees and brush intervening. The tracks made by the horses, after leaving the place where the corpse lay, were, in places where the ground was clear and open, some four or five feet apart, and when they passed through brush and trees they were close together, and no brush and trees between them; but they followed along, one in the trail of the other. . . . All the tracks I have described seemed to have been made near or within a few hours of the same time. When I and those with me made tracks they were not like those I have been describing. Those I have been describing were made in soft or wet earth. Those we made, if any, were in dust. The horse which made the larger track was partly shod, but I do not think shod all around. I am not positive as to that. The smaller horse was not shod."

The witness saw blood under the head of the body, a little on the leather which connected the two pouches of a pair of saddle-bags found with the body, a little on one blanket, and a pool of blood three or four inches in diameter on the ground under the head. Witness dug into the ground some three or four inches, and found the ground saturated with blood to that depth. He attempted, but failed, to ascertain, by digging, the extent to which the blood at the pool had spread. The ground was too hard to dig with a knife. The dead man's eyes were closed, and the hair and skin near the wound were powder-burned. The burned spot was not more than two inches in diameter. The corpse was taken to Anson, where it was photographed by Mr. M. H. Rhoads, an artist. Rhoads gave one of the photographs to Deputy Sheriff Scarborough. The body was then buried at Anson. Witness was first informed of the discovery of the body by J. K. Little, who, with other parties, saw it before the witness did. Witness was present and saw Dr. Hollis take the ball out of the head. Witness secured and kept that ball for some time. He compared it with a ball of thirty-eight caliber, and thought it of that size. It was somewhat flattened, and may, as a matter of fact, have been fired from a forty-one caliber pistol.

The country surrounding the point where the body was found was prairie, but generally very brushy. Immediately north of the corpse the country was open, but to the east, south and southeast of the corpse the country was very brushy. The witness saw the saddle found with the body. A small piece, about an inch wide, had been cut out of the left stirrup leather, on the inside.

George Scarborough was the next witness for the State. He testified that he was deputy sheriff of Jones county, Texas, in April, 1884. He had never seen the defendant, to know him, prior to his arrest for the murder of Ogle. On the 7th or 8th of April, 1884, Mr. Rhoads, the artist, gave the witness a photograph of a dead man. The witness immediately instituted an investigation into the manner of his death, and made search for the defendant. Witness exhibited the picture to B. F. Britton, on the Wednesday after he received it. He went to Abilene, Baird, Clyde, Cisco, and then to Bosque county, where he found and arrested the defendant at his father's house, about three miles from the town of Iredell, and brought him to Anson. Witness showed the picture to J. N. Ogle, who identified it as the picture of E. Price Ogle. A man who claimed to be the constable of Iredell precinct, J. N. Ogle, and six other men accompanied the witness to the house of defendant's father, to make the arrest. The party surrounded the house, the witness knocked at the door, which was opened by the defendant in person. As per agreement none of the arresting party spoke when they confronted the defendant, and if he said anything the witness did not hear it. After the arrest of the defendant he told the witness where he would find the watch, but did not say that the watch belonged to the deceased. Witness found the watch where the defendant said it would be found. Newt. (J. N.) Ogle claimed the watch as the property of the deceased, and the witness gave it to him. Defendant at the same time told the witness that he had exchanged hats with a man in Abilene. Witness ascertained this statement to be true, recovered the hat exchanged, and delivered it to Newt. Ogle, who claimed it as the hat of the deceased. Defendant told the witness that he got the watch from Price Ogle in exchange for a saddle.

J. N. Ogle, the brother of E. Price Ogle, deceased, was the next witness for the State. He testified that he had known the defendant about thirteen years, during which time, until his implication in the murder of witness's brother, relations of the friendliest character had subsisted between them. The deceased did not live permanently with the witness, but spent much of his time at witness's

house.  He and defendant were reared together from boyhood, in Bosque county, and were schoolmates, and, to all appearances, had always been the best of friends.  The witness last saw the deceased at his, witness's, house, between the 10th and 15th of March, 1884. He then appeared to enjoy good general health, but was lame of his left foot, which he had cut with an axe during the early part of December, 1883.  His wounded foot confined him to his bed pretty much the whole of the month of December, 1883, but the foot was healing over when witness last saw it in March.  Deceased had an attack of fever in January, 1884.  Witness sold the deceased a double cased silver watch when he last saw him.  Witness since saw that watch at Austin's jewelry shop in Cisco, and identified the same on this trial.  When the witness last saw the deceased he had the brown or dark bay horse which the witness recovered from the possession of C. W. Merchant of Abilene, in April, 1884, subsequent to the death of the deceased and the arrest of the defendant.  Witness had sold that horse to the deceased in October, 1883.  That horse was now in the witness's possession.

The witness first heard of the death of his brother, E. P. Ogle, on the 11th day of April, 1884, on which day Deputy Sheriff Scarborough, of Jones county, exhibited to witness a photograph of his brother's corpse.  Witness aided in the arrest of the defendant, and his transportation to Jones county.  A light colored hat, which much resembled that last worn by the deceased, and which the witness, though he could not so absolutely swear, believed to be the hat last worn by deceased, was recovered at Merchant's house in Abilene.  Witness did not know when the deceased left Bosque county, going west, as he left without informing witness that he was going.  When witness last saw the deceased he had a second-hand saddle, which he said he got from the defendant.  The witness knew that the defendant owned a mare and a colt in Bosque county, but could not say that he did or did not own other horse stock. Witness saw the defendant at the defendant's father's house on the 10th day of April, 1884, the day before witness heard of his brother's death.  Defendant was then going to mill and took a bag of corn for the witness.  Witness and defendant were then friendly. Witness saw him next, on the following day, at his father's house, when he was arrested, witness having approached the house in advance of the arresting party to ascertain whether or not defendant was at home.  On neither of these two occasions did the defendant say anything to witness about the deceased.  The hat in evidence, the same recovered by Scarborough from a man named Hamilton,

at Claib. Merchant's house in Abilene, was of the same brand, color, make and style as the hat worn by deceased when witness last saw him, and witness believed it to be that identical hat.

Robert L. Hamilton was the next witness for the State. He testified that he lived with Claib. Merchant in Abilene, Texas, in April, 1884. He was acquainted with the defendant, whom he first saw at Merchant's house in Abilene on the 4th day of April, 1884. He came to Merchant's house about 10 o'clock A. M., riding a bay horse, with a dun pony following behind. He staked the dun pony and rode the bay horse into the town of Abilene. He left a thirty-eight caliber Colt's pistol with witness, to keep until his return from town. One chamber was empty and five were loaded. The cartridge shell was still in the empty chamber, but witness could not tell how long before that the chamber was discharged. The defendant returned to Merchant's house that evening, and was hired by Merchant to go to work on his ranche. Next morning he started, on the dun pony, in a northern direction towards Merchant's ranche, leaving the brown or bay horse; which, he said, he had sold to Mr. Merchant. On the following Monday evening defendant came back to Merchant's house on foot from the direction of Abilene. Merchant lived, the witness thought, in the corporate limits of Abilene, but a mile at least from the depot. He remained at Merchant's house until after supper, when he left. He was then wearing a light-colored hat, which he exchanged to the witness for an inferior hat, explaining that he took the hat from some one in Bosque county, and did not want to wear it back there; that he was going to Bosque county to clear himself of the charge that he had stolen the horse he was riding, and that when he returned a re-exchange of hats could be made. Witness did not again see the defendant until after he was arrested and brought back to Merchant's. The officer in charge of the defendant then returned to the witness the hat which he had exchanged to the defendant, and took possession of his own hat. While at Merchant's the defendant bought a pair of boots and left there a pair of button shoes, about number six in size. The heel of the right shoe was run down to the right side. When he left Merchant's house, on Saturday, he went off on the Double Mountain Fork road, which crosses Dry California creek about thirty-five miles from Merchant's. The brown or bay horse was shod all around; the dun pony was not shod.

In connection with the testimony of this witness, which is the subject-matter of the eighth head-note of this report, it is deemed

important to set out the defendant's bills of exception numbers 2, 3 and 6.

Bill of exceptions No. 2 reads as follows: "Be it remembered that on the trial of this cause, the State proposed to prove by the witness Hamilton that a brown horse was sold by the defendant to Claib. Merchant about April 4, 1884, and that later one Newt. Ogle, brother of the deceased, came to Merchant and claimed the horse as the property of the deceased. The defendant, by counsel, objected on the grounds: 1. That the testimony to that point showed the prisoner was under arrest on the charge of murdering the deceased at the time of the claim. 2. That the testimony was irrelevant in view of the explanation made by the State's attorney in open court as to their motive for asking the question, to wit: to show that the horse in question was the property of deceased, and to show a motive on the part of defendant for murdering the deceased to get the horse. The court overruled the defendant's objections and permitted witness to testify that Newt. Ogle, brother of the deceased, claimed and took the horse from Merchant as the property of the deceased; to which ruling defendant excepted," etc.

Bill of exceptions No. 3 reads as follows: ". . . on the trial of this cause counsel for the State propounded to witness Hamilton this question: 'Did you ever get your hat back?' Counsel for the defense objected to the question upon the grounds: 1. That it was a leading question. 2. That the witness Hamilton had already testified that the defendant was under arrest at that time, and therefore Hamilton could not tell what was done by an officer or any one else while the defendant was under arrest, to criminate him. 3. Upon the further ground that the court had just previous to this ruled all of the testimony of the witness Hamilton out, and excluded it from the jury upon the ground that the defendant was under arrest, wherefore defendant excepts," etc. To this bill of exceptions the trial judge attached the following explanation: "Approved with this explanation: counsel for the State withdrew the question objected to, and asked: 'What ever became of your hat?' To which the witness replied: 'Mr. Scarborough gave it to me.' The witness had answered 'yes' to the first question, before the withdrawal above mentioned."

The sixth bill of exception reads as follows: "Be it remembered that on the trial of this cause, the witness for the State, George Scarborough, being on the stand, the State's attorney asked the witness if the defendant, at the time he was arrested, told him where

he could find a certain watch, referred to by other witnesses on the trial? The defendant, by counsel, objected to the question, which was in words as follows: 'Did the defendant, after you arrested him, tell you where you could find a watch belonging to the deceased, Price Ogle?' Objected to for the reasons, first, that the question was leading. Second, that it stated as a conclusion that the watch was in fact the property of the deceased, when in fact this was one of the issues in controversy. Third, that it was irrelevant. Fourth, that the remark sought to be adduced was made, if at all, after the defendant had been arrested on the charge of murdering Price Ogle, and all such testimony was improper. The court overruled the defendant's objections, and the attorney for the State having guarantied that he would prove the watch the property of the deceased at his death, he was permitted, over the defendant's objections, to ask the following questions, and received the following answers, viz.:

" Question. 'Did the defendant, after you arrested him, tell you where you could find a certain watch belonging to the deceased?'

" Answer. 'Yes. But hold on. He told me where I could find the watch, but he did not tell me that the watch belonged to the deceased.'

" Question. 'Did you find the watch there?'

" Answer. 'Yes.'

" Question. 'Where is the watch?'

" Answer. 'Newt. Ogle, the deceased's brother, claimed it as Price Ogle's property, and I gave it to him.'

" Further, the State's attorney asked the witness if the defendant, after he was arrested, told him where he could find any other of deceased's property, and the defendant's counsel objected for the same reasons set out above. The State's attorney having undertaken to guaranty that he would show by the witness that defendant told him where he could find a hat belonging to deceased, the court, over defendant's objection, permitted the witness to testify that defendant told him, after he was arrested, that he exchanged a hat in Abilene with one Hamilton; that the hat was found by him there, and that Newt. Ogle, brother of the deceased, having claimed it as the property of the deceased, he gave it to him; to which defendant excepted," etc.

W. L. Purcell testified that he first saw the defendant at Merchant's house on Saturday morning, April 6, 1884. He saw him when he left Abilene on that morning to go to Merchant & Purcell's ranche. The defendant was then riding a dun pony, for which

the witness made with him a conditional trade. The defendant told the witness in the negotiation that the pony was worth $40, which witness agreed to pay him if he would take the pony to the ranche, brand and turn him loose. Defendant did not reply, but rode the pony off in the direction of the ranche. The pony was then unshod. The witness did not again see the defendant until after his arrest, some eight days later.

Doctor C. W. Hollis testified that he held a *post-mortem* examination of the dead body of a man found in Jones county, in April, 1884. The gun or pistol ball which caused the death of the deceased entered the head immediately in the rear of the right ear, ranged through the brain and lodged against the inner table on the opposite side of the skull, at the upper edge of the upper temple. Witness extracted the ball, which appeared to be a pistol ball of thirty-eight caliber. Such a wound would almost infallibly produce instantaneous death. The dead man's eyes were closed, but witness could not declare, for that reason, that the deceased was asleep when shot, as the eyes of a person awake, when shot, would naturally close. A shot through the brain will produce almost instant death, but will likewise cause a convulsion or distortion of the head and limbs. The point at which the ball entered the head was powder-burned, and the witness was of opinion that the muzzle of the weapon from which the shot was fired was held at a distance from the head not exceeding twelve inches. There were no other marks of violence on the person of the deceased except an old cut, nearly healed, on the left foot.

P. G. Hatchett was the next witness. He testified that on Saturday, April 5, 1884, or thereabouts, he went from Anson, in company with Messrs. Pendley and Cowsert, to Dry California creek, where the body of a dead man had been discovered. This witness's testimony related exclusively to the tracks of the men and horses about the vicinity of the place where the body was found, and coincides substantially with the narrative of the witness McLendon. The larger man's track, about a number nine, was made by a pair of unmatched boots or shoes. The foot of the deceased was about a number nine in size. The smaller track was, the witness thought, a number seven or eight in size. The heel of one shoe making this track was run down. Witness would judge that the defendant's foot, according to the boots he had on, was a number seven or eight in size.

M. H. Rhoads was the next witness. He testified that he was an artist by profession. He was called upon by Justice of the Peace

McLendon to photograph the corpse of a man in Anson, Jones county, in April, 1884. He made two photographs of the corpse, and gave them to Deputy Sheriff Scarborough. The State closed.

Alfred Taggart was the defendant's first witness. He testified that he lived in Bosque county, Texas, and knew the defendant, and also the deceased in his life-time. Witness heard of the death of Price Ogle on the day before the arrest of the defendant for this murder. The witness knew that the defendant and Price Ogle left Bosque county during the latter part of March, 1884. Two or three days before their departure for the west, Ogle told the witness that he was to furnish the horses and the defendant the saddles to be used on the trip. Ogle said nothing about trading horses with defendant that the witness could remember. Ogle was then riding a tolerably good bay horse. Witness did not know what kind of horse the defendant rode on his trip west. J. N. Ogle, after the news of Price Ogle's death was received, brought a dun-yellow or claybank horse back to Bosque county.

Robert Fossett testified, for the defense, that the defendant owned, at one time during the year 1884, several mares and colts. Witness sold him three mares and two colts. Witness had also traded shoes with defendant, and knew that defendant's foot number was five.

Russell Seal testified, for the defense, that in April, 1884, he lived in Palo Pinto county on the east bank of the Brazos river. Two young men went through Palo Pinto county about the last of March or first of April, 1884. They said that their names were Arthur Loyd and Price Ogle; that they were from Bosque county, and were going west. Ogle was riding a bay or brown horse, and Loyd a dun pony. Witness heard them talking about the ownership of the horses while they were feeding. They talked like the brown horse belonged to Loyd and the dun pony to Ogle. Witness asked Ogle why he was not riding his own horse, and he replied that his horse was skittish and hurt his sore foot.

John D. Irwin testified, for the defense, that he lived in the eastern part of Palo Pinto county, near the Brazos river. He had no personal acquaintance with Price Ogle, but saw him at his, witness's, house, with defendant in March, 1884. They said they were from Bosque county, and spoke of going to work for Purcell & Merchant, or for Goodnight on Pease river. Ogle was riding a brown horse and the defendant a dun pony. Witness proposed to trade for Ogle's brown horse. Ogle declined, saying the brown horse belonged to Loyd and the dun pony to him; that he had a sore foot, and was riding the brown because he was the gentler horse of the two.

Geo. W. Loyd, the father of the defendant, testified that he lived in Bosque county. He knew when defendant and Price Ogle left Bosque county, to go west. Defendant had two saddles when he left. Witness did not know how much money he had, but gave him $25 in silver just as he was starting.

A witness whose name is not given testified, for the defense, that he lived in Bosque county, Texas, in April, 1884. He then owned a dun or yellow pony. It ran on the range some three or four miles from witness's house. Witness never sold, or authorized any one to take, that pony. Witness recovered that pony at Clyde, Texas, in April, 1884, through J. N. Ogle. That pony was stolen from his range in April, 1884.

Mr. Maloney testified, for the defense, that he lived on Green's creek, in Erath county, Texas. Some time about the last of March or first of April, 1884, two men from Bosque county came to witness's house, hunting, they said, for stolen horses. They asked if witness had seen two young men named Arthur Loyd and Price Ogle, going west, in charge of a lot of horses,— that a report was rife that they had driven off a lot of stolen horses. The witness being unable to give them any information, they continued their journey west.

J. B. Webb testified, for the defense, that he lived in Abilene, Texas, in April, 1884. Some time during that month Mr. Jackson, while building fences, about two and a half miles from Abilene, had a saddle stolen from him. Late in that month, witness went with Mr. Jackson to Anson, and recovered that saddle from the custody of Mr. W. H. Smith, district clerk. One of the stirrup leather caps was cut. Witness did not think it was cut in that manner before it was stolen.

The motion for new trial assailed the charge of the court and denounced the verdict as contrary to the law and the evidence.

*Bentley & Bowyer*, for the appellant, filed an able argument on the facts of the case.

*J. H. Burts*, Assistant Attorney-General, for the State

HURT, JUDGE. At a former day, at the Austin term of this court, to wit, on the 23d day of May, upon motion of the assistant attorney-general, this appeal was dismissed. This motion was based upon the following order and affidavits:

"Exhibit A.

"The State of Texas, *To the Sheriff of Mitchell County, Texas:*

"You are hereby commanded to receive into custody and safely

keep Arthur Loyd, who has been convicted of murder in the second degree, and his punishment assessed at forty years' confinement in the State penitentiary, and him safely keep to await the result of his appeal in this case.　　　　　Wм. KENNEDY,

"*Judge* Thirty-second District."

"THE STATE OF TEXAS, }
　*County of Mitchell.* }

"Before me, J. E. Hooper, clerk of the district court of Mitchell county, Texas, this day appeared Wayne Parks, who, being by me duly sworn, deposes and says on oath that the above and foregoing is a true and correct copy of the original order of commitment in the Arthur Loyd case in the sheriff's office of Mitchell county, Texas.　　　　　WAYNE PARKS,

"Deputy Sheriff of Mitchell County, Texas.

"Sworn to and subscribed before me May 21, 1885.

[SEAL.]　　　　　"J. E. HOOPER, Clerk,

"District Court Mitchell County."

"THE STATE OF TEXAS, }
　*County of Mitchell.* }

　　　"THE STATE OF TEXAS }
　　　　　*v.*　　　　　} Charge, murder.
　　　ARTHUR LOYD,　　　}

"*To D. G. Hill, District Attorney Thirty-second Judicial District of Texas*:

"I, Wayne Parks, deputy sheriff in and for Mitchell county, Texas, respectfully represent that, at the February term of district court of Jones county, Texas, in a certain cause wherein the State of Texas was plaintiff and Arthur Loyd defendant, charged with the crime of murder, the defendant, Arthur Loyd, was convicted of murder of the second degree, and his punishment assessed at forty years' confinement in the State penitentiary. That, after said conviction and sentence of Arthur Loyd, on said charge of murder at said term of court, the defendant was, by an order of commitment by Wm. Kennedy, district judge of the thirty-second judicial district, a copy of which is hereto attached and marked Exhibit A, placed in the custody of R. C. Ware, sheriff of Mitchell county, Texas, to be by him safely kept to await the result of the appeal taken by the defendant, Arthur Loyd, to the court of appeals in this case. That heretofore, to wit, on the 3d day of May, 1885, the defendant made his escape from the custody of R. C. Ware, sheriff as aforesaid, while he was so legally held in the county jail of Mitchell county, Texas, to await the result of his appeal as aforesaid, and the defend-

ant Loyd was recaptured on said 3d day of May, 1885, but did not voluntarily return.                              WAYNE PARKS,

"Deputy Sheriff of Mitchell County."

"THE STATE OF TEXAS, }
    *County of Mitchell.* }

"Before me, J. E. Hooper, clerk of the district court of Mitchell county, Texas, this day personally appeared Wayne Parks, deputy sheriff of Mitchell county, who, being by me duly sworn, deposes and says on oath that the above and foregoing is a true and correct state of facts in the case of Arthur Loyd.

"Given under my hand and seal of office in Colorado this 21st day of May, 1885.

        [SEAL.]                              "J. E. HOOPER, Clerk,
                                        "District Court Mitchell County."

Appellant submits a motion for rehearing upon the motion to dismiss, insisting that the court erred in sustaining said motion and dismissing his appeal.

Article 845, Code Criminal Procedure, provides that: "In case the defendant, pending an appeal in a felony case, shall make his escape from custody, the jurisdiction of the court of appeals shall no longer attach in the case; and upon the fact of such escape being made to appear, the court shall, on motion of the attorney-general, or attorney representing the State, dismiss the appeal; but the order dismissing the appeal shall be set aside if it shall be made to appear that the accused had voluntarily returned to the custody of the officer from whom he escaped, within ten days." Article 846 provides: "When any such escape of a prisoner occurs, the sheriff who had him in custody shall immediately report the fact, under oath, to the district or county attorney of the county in which the conviction was had, who shall forthwith forward such report to the attorney-general, at the court to which the transcript was sent; and such report shall be sufficient evidence of the fact of such escape to authorize the dismissal of the appeal."

Now it is contended by counsel for appellant that such report of the sheriff will not be sufficient for a dismissal, unless the facts constituting the escape are set forth in the report; that merely to state that the person *escaped* is simply the sheriff's conclusion; that the facts must be stated in order that this court may pass upon them and determine whether the prisoner did in fact escape.

We are of the opinion that the facts constituting the escape should be set out in the report of the sheriff, so that this court may inspect the same, and determine whether they, in law, constitute an

escape. By the law of this State, from convictions in all felony cases the party convicted has the right to appeal to this court. This is a valuable and a very important right, guarantied by the Constitution as well as by an act of the Legislature; and hence the citizen should not be deprived thereof, unless, upon clear and undoubted proof, it appears that the right has been by him forfeited. No conclusions or impressions of the sheriff, or other officer making the *report* of the escape, should be indulged. The facts and circumstances constituting the escape should be stated in the report. (Willson's Cr. Forms, p. 476, Form 950.)

The officer says "that Arthur Loyd, convicted in Jones county, Texas, in February, 1885, of the murder of E. Price Ogle, was in jail in Mitchell county, Texas, on the 3d day of May, 1885; that on said date he got out of said jail, and was captured about two hundred or three hundred yards therefrom, and returned to and into said jail within fifteen or twenty minutes of the time he got out, as aforesaid."

The officer from whose custody the defendant is alleged to have escaped, having made a statement of the *facts attending the supposed escape*, we will look to these facts, and if, indeed, there was not an escape, his appeal will be reinstated.

Do the facts, therefore, show an escape? This question leads us into an examination of what constitutes an escape. Mr. Abbott, in his Law Dictionary, in treating of this word, says: "In its ordinary popular sense the word suggests only the voluntary withdrawal of a prisoner from custody, and this an actual and complete one. The word would only be considered applicable where a person in custody gets free and goes at large. The technical sense includes more than this; wrongful or careless relaxation of imprisonment by the officer in charge is called an escape, even in cases where the prisoner does not go at large. The meaning of the word must be considered in three aspects: as a default in duty by the sheriff or jailer, subjecting him to liability for damages, at the suit of a creditor injured by the escape; as a misconduct, or even offense, by the prisoner or by the officer; and as calling for a pursuit and recaption. Considered in the second and third of these aspects, the word probably has substantially its vernacular meaning. A prisoner does not commit the crime of escaping, nor is authority for a recaption necessary, unless there is a voluntary and complete departure from custody. But in the first mentioned use, which is the one most frequently observed, it has a wider extension." (Vol. 1, p. 437.)

We are of the opinion that the meaning to be given to the word " escape," in article 845 of the Code of Criminal Procedure, should be in its ordinary and popular, or vernacular, meaning. This view is strengthened by article 10 of the Penal Code, which says: " Words which have their meaning specially defined shall be understood in that sense, though it be contrary to their usual meaning; and all words used in this Code, except where a word, term or phrase is specially defined, are to be taken and construed in the sense in which they are understood in common language, taking into consideration the context and subject-matter relative to which they are employed."

Therefore, to constitute an escape under said article, the prisoner must " actually and completely " withdraw himself from custody; that he must " get free and go at large."

Now, applying this meaning to the word "escape," let us look again to the last affidavit of the officer,— that which pretends to give the facts attending the supposed escape, and see if indeed there was an escape.

The facts stated in this second affidavit are quite meager and uncertain. They are that the prisoner got out of jail, and was captured about two hundred or three hundred yards therefrom, and returned to and into said jail within fifteen or twenty minutes of the time he got out, as aforesaid. Now these facts, we think, do not show an escape, as that word is defined above. Nothing beyond an attempt is shown. The officers may have been in hot pursuit, and, by capturing the appellant, prevented him from " actually and completely withdrawing himself from custody," and " getting free and going at large."

It is also contended by counsel for appellant that, as article 845 gives the prisoner ten days in which to return to custody, a capture before the expiration of the ten days will not deprive the prisoner of his right to have his appeal reinstated; that he has the ten days in which to reflect on his situation, and the consequences, etc., and that though the jurisdiction of the court of appeals may have been divested by the escape, still, if he is in custody before the ten days expire, whether he returns voluntarily or is captured and forced back into custody, the jurisdiction of this court reattaches, and of consequence his appeal, if dismissed, must be reinstated.

We do not think this position is sound. By article 845, if there be an escape the jurisdiction of *this court* " no longer attaches in the case." And in order to bring the case within the jurisdiction

of this court,— to reinvest this court with jurisdiction over the case,— a certain thing must absolutely be done by the prisoner. He must *voluntarily return* to the custody of the officer from whom he escaped; and this *voluntary return* must be *within ten days*. For this court's jurisdiction to attach, having been divested by the escape, the return must not only be within ten days, but such return must be *voluntary*.

But it is insisted that to dismiss appellant's appeal upon the *ex parte* affidavit of the sheriff would be in violation of sections 10 and 19 of the Constitution. These sections of the Constitution certainly have no application to cases after trial and conviction. The accused must have a speedy trial by an impartial jury, etc., and be confronted with the witnesses against him. (Section 10, article 1.)

While it is true that a party convicted of felony has a constitutional right to appeal, and this right is given without a provision to the effect that the Legislature may prescribe regulations by which this right may be enforced (sec. 6, art. V, Constitution), still we have no doubt that the Legislature has the power to prescribe such regulations, and, if reasonable, they will not be in violation of the Constitution.

But this question is not now before us. In this case appellant has certainly been awarded his right of appeal. Now the question is: If pending his appeal he should escape, thereby withdrawing himself from the practical jurisdiction of this court, has the Legislature the right to declare such escape an abandonment of his appeal? We think so. At common law if a party, being in custody for felony, escape, he would be guilty of felony. (Archbold's Crim. Prac. and Pl., p. 1862.)

Again: let us suppose that the convict, pending his appeal, should escape and remain at large twenty or thirty days; what disposition should be made of his appeal? Must this court pass upon his case during the time of his freedom? Clearly not, for if the judgment be affirmed there would be no prisoner to respond to the mandate.

Should this court wait until his return to custody? How long must it wait? Until it suits the prisoner's convenience? We think that without a statute upon this subject this court would have the right to treat such escape as an abandonment of his appeal, and dismiss the same. Hence, we are of the opinion that article 845, Code of Criminal Procedure, is not only reasonable but eminently wise.

Because in this case the facts do not show an escape, the rehearing is granted, the order of this court dismissing this appeal is hereby vacated, and the appeal reinstated.

*Ordered accordingly.*

[Opinion delivered October 21, 1885.]

[REPORTER'S NOTE: The above opinion, upon the appellant's motion to reinstate the appeal upon the docket, the same having been at a previous term of the court dismissed, was delivered on the 21st day of October, 1885. The opinion upon the merits, which follows, was delivered on a subsequent day of the term.]

HURT, JUDGE. Appellant, Arthur Loyd, stands convicted of the murder of E. Price Ogle, the verdict being for murder of the second degree, with forty years' confinement in the penitentiary as the punishment. We have given this record and the able brief of counsel for appellant a very careful consideration, and the conclusion reached is that there is but one matter presented in the record which demands discussion.

It appears from bill of exceptions No. 2 that the State, over objection, proved by the witness Hamilton that a brown horse was by defendant sold to Claib. Merchant about the 4th day of April, 1884, and that afterwards one Newt. Ogle, brother of deceased, came to Merchant's and claimed the horse as the property of deceased. The confession of defendant that he had sold the horse to Merchant was made one or two days after the homicide. Now if the horse sold to Merchant was the same ridden by deceased at the time of the murder, the fact that defendant was in possession of this horse soon after the murder was, under the peculiar circumstances of this case, of the first importance, and though in arrest, if he informed Hamilton of the whereabouts of the horse, and in pursuance of this information the horse was found, this fact would most evidently be admissible. But, to make this *confession* competent, the horse must be found in pursuance to the information obtained from defendant. We are not to be understood that the *fact* that defendant sold the horse to Merchant just after the homicide could not be shown, *independent of defendant's confession.* We do not understand counsel for appellant to object to the admissibility of defendant's confession "that he had sold" the brown horse to Merchant. But his objection is to that part of Hamilton's evidence in which he is permitted to state "that later one Newt. Ogle, brother of deceased, came to Merchant's and *claimed the horse as*

*the property of deceased."* By these facts the State proved that the horse sold to Merchant soon after the homicide was the property of deceased, thus establishing, under the peculiar circumstances of this case, a very cogent if not conclusive fact against defendant.

The fact that Newt. Ogle claimed the horse as the property of deceased was unquestionably incompetent, being evidently hearsay testimony. But was appellant in the slightest degree injured by this evidence?

Hamilton stated that Newt. Ogle claimed the horse sold by defendant to Merchant as the property of deceased. This was hearsay and inadmissible. But what says Newt. Ogle in reference to the horse? He says: "E. P. Ogle had a horse when I last saw him which I had sold him. It was a brown horse, or a dark bay. The horse was branded on the shoulder with a bar or dash. I traded the horse to E. P. Ogle, I think, in October, 1883. I saw the horse when my brother left on him, and I saw him again in the possession of Mr. C. W. Merchant, in Abilene, in April, 1884, I think on the 16th day. I got the horse from Merchant and have him now at home."

Hamilton stated that Newt. Ogle claimed the horse as the property of his brother E. P. Ogle. Newt. Ogle says that he got the horse from Merchant, and that in fact it was the property of his brother E. P. Ogle. All of the possible injury which could have resulted to defendant from the testimony of Hamilton with reference to this matter was eliminated from the case by the direct, positive testimony of Newt. Ogle to the fact that the horse was the property of the deceased. The hearsay testimony of Hamilton could not have added strength to the positive evidence of Newt. Ogle, he (Ogle) being the same fountain or source.

The same point is raised in bill of exceptions No. 6 with reference to the watch of defendant. Hamilton states that defendant while under arrest told him where to find a watch, and that he found a watch as directed by defendant; and, when asked by the State's counsel, " where is the watch," answered, " Newt. Ogle, deceased's brother, claimed it as Price Ogle's property, and I gave it to him."

Newt. Ogle swears that he had gotten the watch, and that the same was the property of E. P. Ogle, deceased. It is evident that the same observations and conclusions made and drawn relating to the testimony of Hamilton touching the brown horse apply to this matter with reference to the watch.

As above remarked, the matters above discussed are those only which require attention. We have, however, given each error as-

signed by appellant a most critical examination, and if there is such error as will require of us a reversal of the judgment, we have not been able to discover the same.

Of the guilt of defendant there is not the slightest doubt, if guilt can be established by circumstantial evidence. Again, the jury, strange to us, found appellant guilty of murder of the second degree. Upon this he should congratulate himself, and feel profoundly grateful for such leniency as the jury in their mercy have awarded him.

There being no error presented in the record, the judgment is affirmed.

*Affirmed.*

[Opinion delivered October 28, 1885.]